**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-35-3 (RC)** |
| **TROY WEEKS,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Troy Weeks to 27 months' incarceration—in the middle of the applicable Guidelines range—three years' supervised release, $2,000 in restitution and a mandatory $285 special assessment.

## I.    INTRODUCTION

The defendant, Troy Weeks, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Weeks, a 38-year-old New York resident, traveled to Washington, D.C. with his older brother, James Weeks.[2]  At approximately 3:00 p.m. on January 6, 2021, Weeks entered the Lower West Terrace "tunnel" where hundreds of rioters were relentlessly attacking police guarding the entrance to the building. Weeks spent approximately four minutes inside the tunnel. During that time, Weeks encouraged other rioters to push against the police, pushed up against the police himself, and tried to grab a can of OC spray from a Metropolitan Police Department Officer. After Weeks left the tunnel, he remained on the Inaugural Stage outside the tunnel. At approximately 3:47 p.m., Weeks reappeared at the mouth of the tunnel where he joined the large crowd of rioters in fighting and pushing against the police for at least twenty more minutes. By approximately 4:15 p.m., Weeks had moved up to the Upper West Terrace and confronted a police officer about the police's presence to "protect the ballots" but not elections. Weeks then moved to the risers on the Inaugural Stage and continued to confront police who were trying to clear the area of rioters. Weeks finally left the U.S. Capitol around 5:00 p.m. when law enforcement reinforcements arrived.

The government recommends that the Court sentence Weeks to 27 months of incarceration. A 27-month sentence reflects the gravity of Weeks's conduct and his late admission of guilt.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] James Weeks was charged in case number 24-CR-131 (BAH). James Weeks pleaded guilty to a single violation of 18 U.S.C. § 111(a)(1) and was sentenced to 27 months' incarceration by Judge Howell on October 4, 2024.

## II.       FACTUAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Offense filed in this case, ECF No. 184, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The government also refers the Court to Exhibit A[3], which is a video compilation showing the chronology of events at the Lower West Terrace "tunnel" on January 6, 2021.

### B.       Weeks's Role in the January 6, 2021 Attack on the Capitol

On the morning of January 6, 2021, Troy Weeks attended the Stop the Steal rally at the Ellipse with his brother, James Weeks. Troy Weeks wore a gray winter coat, black gloves, a black backpack, jeans, and tan shoes.



*Image 1: Still image from open-source video of Troy Weeks at the Stop the Steal rally*

---

[3] The government will provide the Court and the defense with copies of its exhibits via USAfx.

As Weeks made his way from the Ellipse to the U.S. Capitol, he passed the Peace Circle, where a loud crowd was gathered and a man declared over a megaphone, "Stop the vote on the electoral ballots!" *See* Exhibit B, open-source video, at timestamp 00:06. Weeks stopped to listen to the speaker at a metal barricade that bore an "AREA CLOSED" sign on it.



*Image 2: Still image from Exhibit B at timestamp 00:23 showing Weeks standing at a barricade next to an "AREA CLOSED" sign*

By the time Weeks reached the Capitol grounds, the crowd on the West Front was huge. Undeterred by the area closed signs, he and his brother waded through the crowd and into the restricted perimeter to get closer to the building.



*Image 3: Still image from open-source video showing Weeks wading through the dense crowd on the West Front of the U.S. Capitol*

Weeks pushed his way to the northwest scaffolding and climbed the stairs to the Inaugural

Stage. Once he reached the stage, he again pushed through the dense crowd toward the tunnel.



*Image 4: Still image from open-source video showing Weeks pushing through the crowd on the side of the Inaugural Stage*

By the time Weeks arrived at the entrance to the tunnel, at approximately 3:00 p.m., there were already thousands of people on the Inaugural Stage, and rioters inside of the tunnel were visibly assaulting the line of police officers trying to hold the mob back from entering the Capitol building there. *See* Exhibit C, open-source video.



*Image 5: Still image from Exhibit C at timestamp 00:15 of Weeks entering the tunnel*

Despite seeing this violence, Weeks entered the tunnel at approximately 3:02 p.m.



*Image 6: Still image from CCTV at 3:02:01 showing Weeks entering the tunnel*

After entering the tunnel, Weeks pushed his way through the crowd toward the police line, which was located just behind the first set of gold double-doors. One of the doors was closed

(though its glass had been shattered), creating a partial barrier which separated police from the rioters. *See* Exhibit D, open-source video. As Weeks moved forward, other rioters around him called out "we need fresh people!" *Id.* at timestamp 00:19. Then as Weeks approached the shut door, he turned and called out to the crowd, "Alright! Get ready to push! C'mon!" Exhibit E, open-source video, at timestamp 00:05. Weeks' brother, James, then turned to the crowd and yelled, "everyone! Push!" as he waved his hand forward toward the police. *Id.* at 00:08.

Weeks and his brother then pushed against rioters in front of them who pushed against the police. At approximately the same time, a nearby rioter claimed to be experiencing a medical emergency. In response, one of the police officers, MPD Sergeant W.B., instructed the rioters to "back up! Back up to the archway so we can get an ambulance! Please!" *See* Exhibit F, MPD body-worn camera footage, at timestamp 00:00. As Sergeant W.B. was attempting to provide aid to the rioter, Weeks reached through the broken glass of one of the golden doors and attempted to snatch Sergeant W.B.'s OC spray from him.



*Image 7: Still image from Exhibit F at timestamp 00:26 showing Weeks grabbing Sergeant W.B.'s hand*

Sergeant W.B. managed to pull the can of OC spray away from Weeks but just two seconds later, Weeks grabbed at the can again. This time, Weeks managed to get ahold of the can.



*Image 8: Still image from Exhibit F at timestamp 00:28 showing Weeks grabbing the can of OC spray for a second time*

Sergeant W.B. once again pulled the can out of Weeks' grasp as the police pulled the man experiencing a medical emergency, who claimed he "couldn't breathe" and was "gonna die," back behind the police line to render aid. *See* Exhibit F at timestamp 00:30. As the police pulled the man back, Weeks' brother reached through the closed door's broken windowpane and pointed at Sergeant W.B., screaming "I'm going to shove it [the OC spray] up your ass! You fat fuck! I'm going to shove that up your ass! We're going to fuck you up!" Exhibit G, open-source video, at timestamp 00:01.

Seconds later, Weeks began to move around the closed door, closer to the police. A nearby rioter called out, "get that door open!" *Id.* at timestamp 00:23. In response, Weeks' brother, James,

moved around the door, turned his back to the police line and pushed the door open as Weeks
approached the police line.



*Image 9: Still image from Exhibit G at timestamp 00:28 showing Weeks at the police line as his
brother pushed open the door*

After the door was opened, Weeks (alongside his co-defendants Micaiah Joseph and Casey
Tyron-Castro) began to fight and push against the police.

11



*Image 10: Still image of Exhibit H at timestamp 00:28 showing Weeks at the police line in the tunnel with his hand on a police shield*

As he stood at the police line, Weeks yelled to the officers—similar to the statements made by the rioter who required medical attention earlier—that he "couldn't breathe," that he was "gonna die," and to "let him through." *See* Exhibit I at timestamp 00:10. He also told officers that he had asthma. *Id.* at timestamp 00:17.[4] Later, he begged the police officers to "please save me!" *Id.* at timestamp 00:45.

A few seconds later, Weeks—who did not show any signs of medical distress—was pushed back by the police, then turned and left the tunnel at approximately 3:05 p.m. *See* Exhibit J at timestamp 00:02.

---

[4]  The PSR does not indicate that Weeks suffers from asthma. In fact, it notes, "he denied suffering from any chronic medical [conditions] or requiring any medications." PSR at ¶ 110.

Further proving he was not experiencing a medical emergency, Weeks stayed on the

Inaugural Stage and on Capitol grounds for approximately two more hours after leaving the tunnel.



*Image 11: Still image from open-source video showing Weeks on the Inaugural Stage ducking his head from the effects of chemical irritant*

At approximately 3:47 p.m., the crowd on the Inaugural Stage organized in a "heave ho"

push against the police line, which was then located under the archway. Weeks was among that

crowd and participated in the push against the police.



*Image 12: Still image from Exhibit K at timestamp 00:08 showing Weeks outside the tunnel pushing in a "heave ho"*

By approximately 4:15 p.m., Weeks had made his way up to the bleachers on the Inaugural Stage and to the south side of the Upper West Terrace where police officers were holding a police line at a row of bike racks. Standing with his hands on the bike rack, Weeks said to officers, "All these fucking police protecting the ballots. Why don't we have this shit when we have elections?" Exhibit L at timestamp 00:34. Weeks then stood at the bike racks as rioters around him implored the police "let us occupy!" Then Weeks said to a nearby officer, smiling, "it's like you're in another country, I know! That's what you're thinking. How the fuck did this happen?" *Id.* at timestamp

14

1:20. Sometime after taunting and mocking these officers, Weeks made his way back to the bleachers around the Inaugural Stage. As the police tried to get the rioters to leave, Weeks defiantly stood on the ledge overlooking the Inaugural Stage.



*Image 13: Still image from Exhibit M at timestamp 00:12 showing Weeks standing on the ledge over the Inaugural Stage as the police behind him attempt to clear the area*

After this, as the police continued to clear the rioters from U.S. Capitol grounds, Weeks finally made his way down to the Inaugural Stage, down the southwest stairs and back to the West Plaza where he finally left Capitol grounds.

## III.    THE CHARGES AND PLEA AGREEMENT

On September 6, 2023, a federal grand jury returned a superseding indictment charging Weeks with six counts, including, violations of 18 U.S.C. §§ 231(a)(3) (Count One), 111(a)(1)

(Count Six), 1752(a)(1) (Count Ten), 1752(a)(2) (Count Twelve), 1752(a)(4) (Count Fourteen), and 40 U.S.C. § 5104(e)(2)(E) (Count Sixteen). ECF No. 114. On May 22, 2024, one week before the start of the scheduled jury trial, Weeks was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement. ECF Nos. 183 and 184.

## IV.    STATUTORY PENALTIES

Weeks now faces sentencing on each of the above six convictions.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces the following maximum penalties on each count of conviction:[5]

- 18 U.S.C. § 231(a)(3) carries a maximum sentence of 5 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and the mandatory special assessment of $100.

- 18 U.S.C. § 111(a)(1) carries a maximum sentence of 8 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and the mandatory special assessment of $100.

- 18 U.S.C. § 1752(a)(1), (a)(2) and (a)(4) each carry a maximum sentence of 1 year of imprisonment; a fine of $100,000, pursuant to 18 U.S.C. § 3571(b)(5); a term of supervised release of not more than 1 year, pursuant to 18 U.S.C. § 3583(b)(3); and the mandatory special assessment of $25.

- 40 U.S.C. § 5104(e)(2)(E) carries a maximum sentence of six months of imprisonment; a fine of $5,000, pursuant to 18 U.S.C. § 3571(b)(6); a term of supervised release of not more than 1 year, pursuant to 18 U.S.C. § 3583(b)(3); and the mandatory special assessment of $10.

---

[5] The plea agreement mistakenly calculated the statutory special assessment for these convictions to total $260. ECF No. 183, ¶ 1.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Guidelines calculation set out in the plea agreement and the PSR. Namely, that the total offense level is 17, when combined with a criminal history category of I, results in a Guidelines range of 24-30 months incarceration.

## VI.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Weeks's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Weeks was on U.S. Capitol grounds for several hours, the majority of which he spent inside or around the Lower West Terrace tunnel, the location of the longest and most violent assault on police officers. And Weeks contributed to those assaults when he grabbed Sergeant W.B.'s can of OC spray. After being pushed out of the tunnel, he then stayed in the area outside of the tunnel and continued to push and fight against the police. In fact, Weeks didn't leave U.S. Capitol grounds until close to 5:00 p.m. when police reinforcements arrived to clear the grounds. Thus, the nature and circumstances of Weeks' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months.

17

**B.  The History and Characteristics of the Defendant**

Weeks is 38 years old and works as a quality technician in Rensselaerville, New York. PSR at ¶¶ 100, 107, and 116. On January 6, 2021, he worked as a "clean room technician" at Regeneron Pharmaceutical. PSR at ¶ 121. He grew up on a farm in New York with his two parents and three siblings. PSR at ¶ 102. He spent several years in substitute care and witnessed domestic violence. *Id.* He is not married and does not have any children. PSR at ¶ 106. The defendant denied suffering from any chronic physical or mental medical issues. PSR at ¶¶ 110-111.

Weeks' history and background are neither aggravating nor mitigating. Weeks had difficult aspects to his childhood but he was no longer a child on January 6, 2021; he was 35 years old. He had (and has) stable employment. His crimes on January 6 were not crimes of necessity, motivated by poverty, abuse or neglect. He had many other choices other than to attack police officers in an effort to break into the United States Capitol building.

Week's history and characteristics, therefore, support a Guidelines sentence.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Weeks' criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. As set out above, Weeks had many other choices on January 6 other than to commit his crimes. His statements on the Upper West Terrace clearly show that he knew Congress was inside counting the ballots from the 2020 presidential election and he still tried to break into the building through the tunnel. Weeks also stayed at the tunnel—and for that matter on U.S. Capitol grounds—for a long period of time, even after he saw (and participated in) the violence against the police occurring there. All of these factors indicate that a Guidelines sentence is necessary to afford specific deterrence in this case.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*,

545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Kevin Galetto*, 21-CR-517 (CKK). Galetto was one of the first rioters to enter the tunnel, and he entered and exited the tunnel twice, spending a total of approximately 15

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

minutes inside. Like Weeks, he encouraged other rioters to enter the tunnel and fight the police. Like Weeks, he pushed officers while inside the tunnel. In fact, he pushed one of the officers in the tunnel so hard he caused him to fall to the ground and then fell on top of him. Galetto pleaded guilty to violations of 18 U.S.C. §§ 231(a) and 111(a)(1), the same two felony convictions in this case. His sentencing Guidelines range was 24 to 30 months and Judge Kollar-Kottelly sentenced him to 27 months' incarceration.

*United States v. Joshua Portlock*, 22-CR-67 (CJN). Portlock was inside the tunnel for approximately 20 minutes. During that time, like Weeks, he pushed up against the officers. In fact, Portlock participated in a heave-ho push and passed a stolen shield forward. Unlike Weeks, Portlock attempted to help the rioter in the tunnel who was experiencing a medical emergency. Portlock pled guilty to a single a violation of 18 U.S.C. § 111(a)(1), whereas Weeks was convicted of six crimes. Portlock's Guidelines range was also 24 to 30 months and Judge Nichols sentenced him to 20 months' incarceration. Weeks' conduct both inside and after leaving the tunnel justifies a higher sentence in this case.

*United States v. James Weeks*, 24-CR-131 (BAH). Weeks' brother, James Weeks, is the most apt comparator. Like Troy Weeks, James Weeks encountered "AREA CLOSED" signs before crossing onto Capitol grounds. James Weeks also entered and exited the tunnel at approximately the same time as Troy Weeks. Like Troy Weeks, James Weeks turned and encouraged other rioters behind them to "push!" against the police. After Troy Weeks tried to grab the OC spray from Sergeant W.B., James Weeks verbally threatened him, calling Sergeant W.B. a "fat fuck" and threatened to "shove that [OC spray] up [his] ass!" Both James and Troy Weeks

pushed against officers inside the tunnel. Unlike Troy Weeks, James Weeks pushed open one of the doors in the tunnel, helping other rioters to assault officers. James Weeks also participated in property destruction at the Capitol when he broke a window near the Senate Wing Door. While these aggravating factors differ from Troy's case, Troy's actions after leaving the tunnel were similarly aggravating. Troy remained at the tunnel for hours after leaving, participated in additional heave-ho pushes and only left the Capitol when law enforcement reinforcements arrived. Troy Weeks was also convicted of six charges and pleaded guilty just one week before his jury trial. James Weeks pleaded guilty to a single violation of 18 U.S.C. § 111(a) and had the same Guidelines range as Troy. Judge Howell sentenced James Weeks to 27 months' incarceration. Troy Weeks should receive the same sentence.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer W.B, did not suffer bodily injury as a result of Weeks's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Weeks must pay $2,000 in restitution, which reflects in part the role Weeks played in the riot on January 6.[10] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Weeks's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 173.

## VIII.  FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See*

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' incarceration, three years of supervised release, $2,000 in restitution and a $285 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    /s/ Kaitlin Klamann
       KAITLIN KLAMANN
       Assistant United States Attorney

25