# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No. 23-CR-35(RC)** |
| **MICAIAH JOSEPH,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## DEFENDANT'S SENTENCING MEMORANDUM

### I.    INTRODUCTION

Mr. Joseph and his lovely wife are still reeling from an unhinged FBI that used a drone and long guns when searching their home.[1] It's fair to say that they will never get over that, just like our country will never forget what happened on January 6, 2021. The defense asks this Court to, for a moment, step outside the J6 scripted narrative of the government and look at the facts of this case. Mr. Joseph, a person who is peaceful, hardworking and concerned about America's future, came to DC to ask questions and find answers about what happened during the election. He wasn't there to assault police officers,  interrupt Congress or stop the vote.  He expected J6 to be like a similar protests he'd attended before in D.C-peaceful and meaningful.  As this Court heard during this trial and  other trials, the protest turned into an unmanageable mob and riot.   He did not harm any officer.

---

[1] The Court may recall from the motion to suppress hearing that an FBI agent pointed his automatic weapon at the crib for a long time.

Mr. Joseph should be sentenced for his conduct and his conduct alone-not the conduct of the other defendants.[2] Mr. Joseph  has spoken about his remorse and holds himself accountable for his actions.

OBJECTIONS TO THE PSR

After carefully reviewing the PSR with Mr. Joseph, the defense filed certain objections with the probation officer.

Mr. Joseph made an objections to paragraphs 32, 33, 34, and 44. *See* PSR. Mr. Joseph also objected to the fact that he was not given 2 levels off under the First Step Act. *See* U.S.S.G. §4C1.1(a)(7), and that he was given a two point upward adjustment for obstruction of justice under U.S.S.G. §3C1.1. *See* paragraph 44.

Mr. Joseph is a perfect candidate for the two point offense level reduction (zero point offender adjustment) recently promulgated by the U.S. Sentencing Commission under 4C1.1.[3] Mr. Joseph objects to not being given this two level

---

[2] Only the most relevant facts will be repeated since the Court heard the trial.

[3] The defendant must meet all of the following criteria to qualify for the 2-level reduction:

1. the defendant has not received any criminal history points;

2. the defendant has not received an adjustment for terrorism (covered by § 3A1.4);

3. the defendant did not use violence or credible threats of violence in connection with the offense;

4. the offense did not result in death or serious bodily injury;

5. the offense of conviction is not a sex offense;

6. the defendant did not personally cause substantial financial hardship (to be determined independently of the application of § 2B1.1(b)(c));

lower adjustment under the guidelines. His individual conduct did not involve violence nor the threat of violence. The Commission promulgated the zero-point offender provision in recognition of low recidivism rates of first time offenders and the Congressional directive "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense." [4] The Commission has identified crimes that are violent or otherwise serious and the conviction here does not fall under the exclusions. In other words, his conduct does not fall within one of the enumerated exclusions to application of this provision.  Mr. Jospeh meets all of these criteria. *See* U.S.S. G. 5C1.1; 28 USC 994(j). In order for a crime to be violent in nature, courts have determined that to qualify as "using violence," one must "use physical force with the intent to injure[.] *United States v. Pineda-Duarte,* 933 F.3d 519, 523 (6th Cir 2019). And "credible threats of violence" require one to credibly "express an intention to inflict pain, harm, or punishment" through violence. *See United States v.*

---

7.  the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

8.  the offense of conviction is not an offense involving individual rights (covered by § 2H1.1);

9.  the defendant did not receive an adjustment under § 3A1.1 (hate crime motivation or vulnerable victim) or § 3A1.5 (serious human rights offense); and,

10. the defendant did not receive an adjustment under § 3B1.1 (aggravating role) and was not engaged in a continuing criminal enterprise.

[4]Amendments to Sentencing Guidelines (April 27, 2023) at 78-80 *(citing* 28 U.S.C.Section 994(j)).

*Hernandez Barajas*, 71 F.4th 1104, 1107 (8th Cir. 2023). The evidence here does not show Mr. Joseph used violence or credible threat of violence nor did he have intent to injury anyone.

Other judges in this courthouse have applied this adjustment with conduct much worse than Mr. Joseph's. In *U.S. v. Yang*, No 23-CR-100(JDB), 2024 WL 519962 (D.D.C. Feb. 9, 2024)(granting 4C1.1 adjustment where defendant grabbed an officer's wrist during a scuffle and was part of a crowd that did not depart in the face of advancing police line). Judge Mehta also rejected the government's argument that just because an individual defendant who was part of a crowd that engaged in violence but who did not himself engage in violence is ineligible for the reductions. *See United States v. Parks*, 21-CR-411. There, the government argument that because the defendant was at the "front of a crowd rush" and was "aware of [violence]," that the adjustment did not apply. Judge Mehta reasoned that the defendant's conduct "did not result in death or serious bodily injury" and the defendant "did not use violence or credible threats of violence." [5] Judge Bates[6] has also rejected this use of violence in not imposing the plus 3 levels under GL 2A2.4(b)(1). *See also, United States v Hunter Palm*, No. 1:21-cr-00393 (RDM)(Judge Moss gave the reduction).

---

[5] *See* Transcript of Sentencing, Tr. at 38.
[6] *See U.S. v. Hazelton*, 21 CR 30 (JDB).

Mr. Joseph has objected to this enhancement. The government's theory is that Mr. Joseph's presence aided and abetted others in making physical contact with the police. Judge Bates reasoned that "we can't assume that his actions assisted any one person with contact with the police and the government here hasn't identified a principal" and "it was not reasonably foreseeable to the defendant under 1B1.3(a)(1)(B) that his actions would cause contact with police."[7] The same applies in this case. Judge Bates rejected this government "indirect pushing concept theory" because the defendant was not at the front of the line by the doors. Likewise, Mr. Joseph never saw anyone at the doors being crushed because of far back he was and had no idea that their intention was to hurt an officer. He did, however, see a protestor being crushed at his feet and tried to help him.

As far as the obstruction, the government cannot prove this and this court should not give this enhancement. The Probation Officer's application of Guideline 3C1.1 for false testimony is in error but in her defense, she is only getting his information from the government. This enhancement only applies upon a finding by clear and convincing evidence that defendant "gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a

---

[7] The defendant in Hazelton had urged others into the tunnel by yelling "move forward." The defendant also believed J6 to be the first shot in a revolution and she blamed the police. She was given 10 days incarceration.

result of mistake or faulty memory." *United States v. Gaviria*, 116 F.3d 1498, 1518 (D.C. Cir. 1997) (per curiam) (*quoting United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). There has been no evidence that anything Mr. Joseph testified about was a material matter with the willful intent to provide false testimony. In fact, Mr. Joseph was completely honest in his testimony to his detriment.  He also testified he was by himself and did not know anyone personally that day,

Pursuant to the United States Sentencing Guidelines (hereinafter "USSG"), Mr. Joseph  believes that the following Guideline sections apply:

| | | |
|---|---|---|
| USSG 2A2.4(a):   Base offense level. | | 14 |
| USSG 4C1.1: no criminal history | | -2 |
| ADJUSTED OFFENSE LEVEL | | 12 |

Based upon these figures, and a criminal history category of I, Mr. Joseph's final guideline range is 10-16 months.

For the reasons set forth herein, Mr. Joseph requests that this Honorable Court  impose a variance and a sentence of home confinement, two years supervised release, 200  hours of community service and $2,000 restitution to account for:

1.    His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that and his sincere remorse in this regard;

2.      His lack of bragging or posting on social media about what

happened January 6;

3.      His amazing commitment to his community and his family;

4.      His long history of a strong work ethic which has allowed him to

be a productive and positive member of society;

**5.**      The fact that he lost his very good job, and his place where he lived

before this case; and

**6.**      His intent to help officers that day, though perhaps misguided, was

evident from his behaviors in the tunnel in assisting in the removal

of a person blocking the police on the ground and by attempting to

disrupt a rioter from using a cattle prod like device on the officers.

**7.      <u>Background</u>**

Mr. Joseph is a father, brother and a son. He has the equivalent of his GED.

Mr. Joseph did not attend college, yet he is obviously very bright and well spoken.

*See* PSR Paragraphs 108-109. When this Court considers and compares the

behavior of other J6 defendants the Court will find that Mr. Joseph was

cooperative and has been cooperative since the beginning of this investigation. His

pretrial release behavior has been stellar, as was his behavior during the trial.

<u>Previous protests</u>

This Court can only understand why Mr. Joseph came to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021 and thereafter. There is absolutely no evidence in this case to indicate he had plans to enter the Capitol, to stop the vote, or commit any violence that day. There is evidence, however, that Mr. Joseph became interested in political speech and assembly before January 6th. He had previously attended rallies in 2020 at BLM Plaza and other protests during his lifetime. His experiences at those rallies informed his expectations for the Jan 6 events. He assumed that it would be a peaceful protest, but always knew anything could happen. Indeed, at a prior BLM rally Mr. Joseph, a black man, was assaulted by people at the rally and several other protestors had to come to his rescue. At these other rallies, he witnessed people interacting with each other and the police. Often the most interesting rhetoric happened there, and as someone keenly interested in the peaceful expression of ideas, this was the place where he might see and experience the true expression of First Amendment rights. The court may remember the body worn camera of Officer Park where Mr. Joseph can be heard telling the officer he just wants to watch. This is completely consistent with Mr. Joseph's behavior at prior rallies.

If the line of officers Mr. Joseph approached on January 6 had been standing in BLM plaza or down on Constitution Avenue, this case would have been very different. If that had been the case, Mr. Joseph and others would have been able to approach the line and peacefully interact with those officers, ask them questions… even shout. Mr. Joseph would have been fully able to watch the interactions, document them or participate as he saw fit as he had done in the past. Mr. Joseph could have walked up to the line with his hands up and stood there in a peaceful manner, even if his presence made it more difficult for the officers to do their job – because wouldn't it be easier to maintain a police line if nobody was at it? But the circumstances of J6 were different for numerous reasons. First, the government had restricted the grounds making entry itself a crime. Second, others in the crowd were violent and assaultive to the officers creating an environment that put the officers and others in danger. Mr. Joseph's intention may have been to witness these events, but placing himself at the front line created circumstances even he did not expect.

It should be noted that by the time Mr. Joseph arrived at the Capitol, evidence of the restrictions on Capitol grounds had been long demolished by thousands of people before him. He had no idea he was walking into a restricted area subjecting himself to potential criminal punishment because by that time the signs were all down. He walked on to the grounds thinking he was entering

another space designated for peaceful protesting much like BLM plaza or the
streets of DC.   He wore the same hat on J6 that he wore at those BLM protests
earlier that year.  (See image below).



*Figure 1*

Indeed, the thousands of protestors already on the grounds of the Capitol
made it reasonable for Mr. Joseph to assume he was at the right place for First
Amendment assembly and speech. For Mr. Joseph, being a witness to the
expression of these ideas was an important part of why he came that day.  Just like

witnessing the historic George Floyd protests drew him to the city in 2020.  When this Court considers all of the factors before it, the Court must conclude that these are not the actions of someone there to overthrow the government or incite violence, but the actions of a curious man with a history of First Amendment activity who intended to witness history rather than obstruct and assault.

### **Mr. Joseph's remorse**

Mr. Joseph believed that he should exercise his First Amendment rights by attending this rally scheduled for January 6, 2021, at the Ellipse on the Mall.   Mr. Joseph is very upset that people died that day, that people destroyed certain areas of the Capitol, and that police officers were attacked by the crowd.   He only learned how horrible the day was  days after the fact by watching the news reports, like the rest of us.  His concern for all those that died and were injured is sincere, and as he walked to the Capitol, he had no idea that the result would be what it was.

He was not aware before he entered the tunnel that the people at the end of the tunnel closest to the brass doors intended to break through those doors-we of course know this in retrospect, but he did not know this at the time. However, he does not dispute that when he was in the tunnel, rioters were violent and dangerous. The reasonable thing to do would be to turn around and walk away. He regrets not doing it at the time.  His inclination was to demonstrate to the officers

his peaceful nature by assuming a non-threatening posture with his hands up.   He

held that posture for over a minute so as to communicate non-verbally with officers

that he was not a threat.



*Figure 2- gov ex. 306*

Mr. Joseph did not rush the line, or charge at the officers.  When given space to

actually communicate verbally with the officers he attempted to let them know he

wanted to witness the events there.  His hands were in a non-aggressive posture the

whole time.



*Figure 3 - gov ex. 209 at 3:05pm*

Officers testified at trial that Mr. Joseph's presence in the tunnel was not helpful, even if his intent was to merely witness the events or even assist officers at certain times. Mr. Joseph now sees that to be true. However, the intent of Mr. Joseph was clear on that day and it was not to assault or otherwise hinder the police. Even when others were pushing against the officers, while also pushing up against Mr. Joseph, he tried  to try and keep his hands away from the officers. It was an almost impossible thing to do, but Mr. Jospeh kept is hands in a defensive posture even as others pushed from behind. This can be seen on several screenshots from government exhibits.



*Figure 4- gov. ex. 308*



*Figure 5- From Gov. ex. 308*

When the crowds began to form a shield wall behind him and then push in from

behind, Mr. Joseph used is hands to make space so as not to be trapped or pushed

to the floor.  One man was on the floor and Mr. Joseph understood the officers to desire this individual get off the ground.  Mr. Joseph attempted to assist in removing the individual.  Indeed, on video it was shown that the officers specifically gave Ms. Tryon-Castro permission to enter inside the doors to assist the man, though the man refused to comply.   Mr. Joseph did not attempt to assault officers, rather he attempted to assist them and make room for someone being crushed at his feet and even try to help get him up off the floor.



*Figure 6 - Gov. Ex. 209 at 3:08:08pm*



*Figure 7 - Gov. Ex. 209 at 3:08:28pm*

Mr. Joseph, has absolutely no history of political extremism. He has no criminal convictions. He had absolutely no expectation or knowledge of the consequences of others' actions that day, nor the consequences that their actions would have on his being present. He was supporting everyday Americans' rights to assemble and speak and thought he was witnessing it as a bystander – not a member of a mob. The day turned into much more than Mr. Joseph or anyone expected and Mr, Joseph's instincts were to assist in any way he could, this included helping the man off the ground, pushing back on people who were pushing police, and handing a gasmask to a protestor who appeared to be struggling to breath.

    While he did not personally destroy anything, or commit violent acts, the jury found that he illegally played a part in a mob. According to Ed Maguire, a

criminologist at Arizona State University, security forces are trained to ignore yelled insults and small acts of hostility, like pushes and thrown water bottles. And they receive training in absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators. Benedict Carey, <u>Making Sense of the 'Mob' Mentality</u>, New York Times (Jan. 12, 2021), available at  <u>https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html</u>  Mr. Joseph  did not commit any of those actions towards police. On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." <u>Id.</u>

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." <u>Id</u>.  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." <u>Id</u>.

## III.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been

convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[8]

## IV.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. <u>Nature & circumstances of the Offense & the History and Characteristics of Mr. Joseph</u>

---

[8] 1.    The nature and circumstances of the offense and the history and characteristics of the defendant;
    2.    The need for the sentence imposed;
    3.     The kinds of sentences available;
    4.    The kinds of sentence and the sentencing range…;
    5.     Any pertinent policy statements issued by the Sentencing Commission;
    6.    The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
    7.    The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

Mr. Joseph was a follower, not a leader. He was not there to stop a vote or to interfere with anyone; that was never his intention. He simply went to DC to be a part of *the process*. He understands that his decision to be a follower and enter the tunnel to witness the action led him to be caught up in the actions of the group in pushing into what became a line of officers. In fact, he thought he was recording the whole things, so he thought what he was doing was to make a record of what was happening just like the lady who recorded the George Floyd incident. The Court will recall he had a phone in his vest but for some reason the phone did not record.

*Punishment for conduct of others*

Despite this acknowledgement of his own role in making these bad decisions, Mr. Jospeh should not be punished for decisions and/or violence perpetrated by other people, especially those with a clear intent and plan to attempt to injure or overrun the Capitol Police and MPD officers that day. He did not engage in violence at any point on January 6th.

Once he got in he made the bad decision not to immediately turn around and leave. He owns that decision. In fact, the video evidence reflects that at times he is not even capable of standing on his own feet at times during the push by others. That action tells the Court that he did not intend to harm any officers as his intent was to survive the chaos himself.

Additionally, there is no evidence his intent was to go into the Capitol illegally.   Mr. Joseph was in the tunnel for two times for a combined approximately 13 minutes.   Much of that time was spent being crushed in the crowd unable to move or retreat.

*Figure 8*

Unlike many others in the crowd, he did not shout for reinforcements, throw objects at the police line or bully or force others into participating in the chaos in the tunnel.   In fact. he stopped one man from using a cattle prod like device to injure officers.  Mr. Jospeh also did not steal or damage property that day. He stood there observing and trying to comprehend.  He was part of a crowd that turned violent.  We now know, that by their mere presence, the crowd overwhelmed the police.   But it should be considered that while others filed into the tunnel that day to fight with police and try to gain entrance further into the building, Mr. Joseph did not. There is no evidence that this was the case. No Facebook posts, no texts to friends or family. Nothing. Most importantly, he never intentionally touched an officer or had any physical contact with any law enforcement officials.

Ultimately, a better path would have been to leave the grounds altogether once he saw what was going on in the tunnel. At points in the day, Mr. Joseph did not have a clear understanding of what has occurring.  As he drew closer to the

tunnel area he could observe people entering and exiting but from his vantage point he was not sure what was happening inside.   His decision to go inside and see for himself is why he is here before this court.   As the videos showed, the crowd on the steps of the tunnel entrance had women, children and members of the media standing there.   Mr. Joseph had a hard time processing whether entry inside was clearly unsafe or illegal.  Indeed, all he could see from his vantage point was a crowd of people exiting and entering the tunnel.  He could not see inside until he was inside due to the incline of the steps and the crowds in front of him.  This made it much harder to assess the real situation and any potential danger at the time.



*Figure 9 - from Gov. ex. 312*

Mr. Joseph's prior experiences at BLM rallies only increased his curiosity about the police reaction that day. Given the large crowd assembled there and his lack of knowledge about the restricted grounds, Mr. Joseph assumed he would be able to witness these events legally. It should be noted that in 2020 - 2021 the media promoted and encouraged the notion that interactions between law enforcement and the public was to be witnessed, documented and revealed– George Floyd's tragic murder by police was only discovered because some random citizen videotaped it and we all saw the truth. Mr. Joseph was unsure of what was happening inside, but believed he might be potentially witnessing something wrong – so he stayed to see how things unfolded – and he takes responsibility for that choice. Hindsight makes the best decision seem so obvious, but in real time, you don't always make the best decision because the best decision is not readily apparent until it's all said and done. Furthermore, just because Mr. Joseph did not make the best decision, does not mean that he made the wrong decision intentionally.

Remarkably, Mr. Joseph did not post any social media on that day or any day thereafter. Since his conviction, he's lost his very good job and had to move farther away from DC where it's affordable.[9] What's critically missing from the

---

[9] The FBI called Mr. Joseph's prior employer and told them that Mr. Joseph was complicit in a murder. He was then fired.

evidence in this case, compared to other J6 cases,  is that Mr. Joseph never says or

texts or emails anyone that says he was there to stop the vote, knew a vote was

taking place or that he ever contemplated obstruction of the Electoral College

Certification.  He would never in a million years intentionally try to harm a police

officer. In fact, it was never established at trial that Mr. Joseph had the intent to

harm anyone, interfere with the certification at all or intended to engage in civil

disorder.[10]

Yet here he is, a non-violent, hard-working American - someone the

government will argue before this Court should go to federal prison without taking

into consideration the fact that he's been law abiding.  For example, lawyers-

lawyers who work for the FBI, that lie on applications for FISA warrants for

political reasons, are not sentenced to prison in this Court-they get probation. *See*

*USA v. Kevin Clinesmith*,  20-CR-165 (JEB).[11]    Mr. Clinesmith-a lawyer- walked

out of federal courtroom in this courthouse a free man without spending a day in

prison. That's a disparity the size of Texas. That's not to suggest that this

honorable Court should therefore give Mr. Joseph a sentence of probation. No, no,

no. What it says is that Mr. Joseph should be punished for his conduct when taking

---

[10] After the events of January 6th, Mr. Joseph did nothing but keep quiet and mind his own business in stark contrast to many other J6'rs whom this Court has sentenced. He didn't go on Tucker Carlson or any other show.

[11] Our system of law needs to address this anger which our legal system is not really set up to address. The only people upset about the FBI lawyer getting probation were other lawyers. But when J6 defendants are sentenced it seems the whole world is upset.

into account all the facts of his particular conduct and no one else's. *See* Disparity, *infra.*

Letters of support will be filed which show  Mr. Joseph is hardworking, kind, generous and law abiding.

The government must concede that he committed no violent acts and destroyed no property, even though he was in the proximity of others committing violence. He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore  clothing that was not designed for J6, but was his normal attire.

By the time Mr. Joseph arrived at the U.S. Capitol, the barriers that had been erected along the perimeter of the building were no longer present. This was shown at trial.  He met no resistance in his walk up to the Capitol. At the time,  he didn't dream he'd be charged for protesting.

This has obviously been a tough road for Mr. Joseph and his family.   He has a very simple life: he worked hard   and tries at every turn to improve himself, support his family,  and be a positive member of society.  It is of utmost importance to him that this Court and fellow citizens understand that he is incredibly saddened and remorseful about what took place on January 6, 2021. *See* Mr. Joseph's letter, exhibit 1. People died, and law enforcement officers and protesters suffered multiple injuries. None of his actions will be erased from the internet. It's there forever.  He has been the subject of a number of media accounts lumping him with others that

were violent, ruthless and well-orchestrated that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished. He's lost the ability to work at a job that he was very good at and loved because of this felony conviction.  In sum, society has already punished him for his actions. It doesn't take a long prison sentence for one to feel remorse or learn from their mistakes.

In determining what punishment is warranted, this Court should not lose sight of the fact that he intended no harm, turned himself in voluntarily and has lived a life with no criminal conduct.  He has been a model of good behavior on pretrial and post-trial release. His past behavior and his post arrest behavior show that he is a very productive citizen and the Court can rely on that as a basis to sentence  him to a term of imprisonment under the guidelines and a term of supervised release of two years considering the 3553 factors.   Mr. Joseph is fortunate. He has the support of his family. Many defendants that appear before this Court don't have that gift.

**B. Need for the Sentence imposed**

**1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already

been severely punished as noted *supra*.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A sentence within the guidelines, restitution and supervised release does constitute punishment  and  it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms while on supervised release. He has been on pretrial release for nearly two years  with many restrictions and has complied with them completely.

The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime."  U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin,

*Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199

(2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Joseph's  likelihood of recidivism is really non-existent. He has

expressed genuine remorse and contrition.  His acceptance of responsibility was

swift, complete and without reservation and exercising one's constitutional right to

go to trial should not be used against him.  A felony conviction will change his life

forever. Research has consistently shown that while the certainty of being caught

and punished has a deterrent effect, "increases in severity of punishments do not

yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and*

*Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy

of Science panels… reached that conclusion, as has every major survey of

evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative*

*Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of*

*Recent Research (1999),* summary available at

http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned

by the British Home Office, examined penalties in the United States as well as

several European Countries. *Id*. at 1. It examined the effects of changes to both the

certainty and severity of punishment. *Id.* While significant correlations were found

between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given his current age, no criminal history and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come.[12] A punishment within the guidelines in this case is going to have the exact opposite effect than what is in the interest of justice. Mr. Joseph urges the Court to impose a sentence of home confinement in light of his non-violent conduct at the Capitol, his immediate cooperation with the FBI, and the lack of a need to further deter him.

### 3. Just Punishment

Mr. Joseph now has a felony conviction which, in and of itself, is quite punitive. The conviction affects possible future job opportunities and will remain with him for the rest of his life. He can't vote, serve on a jury or carry a gun. But home confinement and supervised release will allow him to continue to work and support his community and continue the volunteering he does in his

---

[12] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

church and in his community.  If incarcerated, there will be only more suffering.

    Given sentences imposed in comparative cases, a sentence of home confinement is  appropriate here.

And after one serves their time, there is supervised release to follow. This involves significant restraints on a defendant's liberty.  Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's rules of the road.  *Jones v. Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives.  *Ibid.*  Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison again.  *Ibid.*

    Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation.  *Ibid.*  They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime.  *Ibid.* [Supervised release] significantly restrains defendants' liberty to do the things that free people in this country are entitled to do.  *Ibid.*

A. **<u>The kinds of sentences available</u>**

A  guidelines sentence of incarceration would  result in sentencing disparity

with other individuals who behaved similarly but were not similarly charged.  That

is, they behaved worse and were allowed to plead to misdemeanors. *<u>See infra</u>*.

Imposition of a fine is discretionary, and, defendant respectfully submits, he

cannot pay a fine in this case since he has lost his income.

B. **<u>The need to avoid unwarranted sentence disparities</u>**

If this Court were to impose a sentence greater than the guideline range,

supervised release, community service, and/or restitution, it would create an

unwarranted sentencing disparity compared to similar cases that have already gone

to sentencing  or are pending in this Court.[13]  Paragraph 170 of the PSR states that

---

[13] For example, *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6
defendant pushed police officers and made contact with them yet the government
chose not to pursue those charges and he was given 3 months incarceration and
allowed to keep his class B misdemeanor deal. Here's what he posted: "was there
for over a half hour. I got gassed several times inside, many times outside the
Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police
inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group
unaffiliated with the government brought to their attention additional violent
conduct by Mr. Reeder, and the government asked to continue the sentencing
hearing. Ultimately, despite concrete evidence of violence, the government chose
not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages
30-41. Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-
5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31,
p. 2. But "Leffingwell was not content to merely stand inside the threshold":
Positioned at the front of the line of rioters stacked hundreds deep behind him,
Leffingwell chanted at the officers standing before him to "join us!" in the rioters'
efforts to assault the Capitol. When some in the crowd shouted for the rest of the

the median length of imprisonment of defendants whose primary guideline was

2A2.4 is 41 months. This is incorrect as applied to J6 defendants. This statistic

includes all defendants, regardless of charge, involving completely different

circumstances and from other jurisdictions that were calculated under this same

guideline and same criminal history category. As this Court knows, each case must

stand on its own facts. In other cases that were prosecuted before other Judges of

this Court that included the 231 count and the misdemeanor counts, the following

---

crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. *Id.,* p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months' incarceration. *Id.,* p. 2. The Court imposed a sentence of six months' incarceration with credit for time served, followed by 24 months of supervised release. Joseph's conduct was nowhere near this.
Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant jabbed him with a lacrosse stick. *Id.* A search incident to arrest recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.

are representative of how other judges have punished defendants: *U.S. v. Cortez*, 21 CR 317 (TSC) 4 months incarceration; *U.S. v. Ryals*, 21 CR 244(CKK) 6 months incarceration and 36 months S/R;[14] *U.S. v Cantwell*, 21 CR 89 (EGS) 5 months incarceration, 36 months S.R.; *U.S. v Grayson*, 21 CR 244 (TSC) 60 days incarceration, 24 months S.R.; *U.S. v. Genoatowski*, 22 CR 125(JMC) 60 days incarceration and 30 days home detention; *U.S. v Geoffrey*, 12 CR 197 (DLF) 6 months incarceration, and 12 months S.R.; *U.S. v. Adams* 22 CR 358 (BAH) 8 months incarceration and 36 months S.R.; *U.S. v. Rockholt*, 23 CR 104 (TNM) 5 months and 24 moths S.R.; *U.S. v. Stecher*, 21-CR-720(RDM)60 days incarceration, 24 months S.R.*; U.S. v. Konold*, 21-CR-160(TJK),60 days incarceration.

In a similar case, *United States v. Cook*, et. al, 23-cr-138 (RBW) all five defendants were in the tunnel.[15]  Defendant Rehyler, who engaged in conduct much worse than Mr. Joseph, received a sentence of 8 months after pleading guilty to the 231 charge. However, according to the statement of facts attached to defendant Rehyler's plea agreement, ECF No. 87,  and the government's sentence memo, ECF No. 153, Mr. Reyher encouraged other rioters to "push" and he entered the tunnel three times, as opposed to twice for Mr. Joseph. *See Id,* p. 3. Mr.

---

[14] "S.R." stands for supervised release.
[15] Long before Mr. Joseph's trial, this court took pleas from  other defendants in this case and read the government's sentence memo.

Joseph never told anyone to push, in fact he angrily yelled at other rioters that were assaulting him. According to the government, Mr. Reyher "continued to fight the officer line." *Id.* He in concert with his wife remained at the front of the mob [in the tunnel] for a full six minutes. *Id.* at 9 "Aurthur Reyher made it face-to-face with the police line and thrust his body directly into police officers… and were "inches away" from the officer stuck in the door." *Id.* This is nicely illustrated in the government's sentence memo. He and his wife also yelled "our house" *Id.* They also "lock[ed] arms or bodies with each other as the rioters-move[d] backwards in unison before rocking and pushing forward together." *Id.* at p. 12. "Arthur Reyher raised his hands and yelled to other rioters, "don't hit 'em! KEEP YOUR HANDS UP AND PUSH!" *Id.* at 13. Mr. Jospeh did not engage in any of this behavior. Incredibly, Reyher also showed other rioters how to do this. *See id*., images at 17-18 and p. 14. He chanted "USA USA" and "our house." *Id.* Again, Mr. Joseph did none of this. Reyhler also "patted rioters on the back as they entered the tunnel."[16] *Id.*

Finally, as if the above was not enough, "Reyher then again, rejoining the rioters at the mouth of the tunnel…encouraged rioters…yelled at the crowd, waved rioters toward the tunnel and passed a bullhorn to a rioter at the front of the police

---

[16] It appears Reyhler was in the tunnel from 2:43 pm and 3:21 pm and spent approximately hour there.

line. " *Id.* at p. 21. Again, Mr. Joseph did nothing of the sort. The cases are not even close.

Mr. Joseph's culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date. These cases demonstrate that the sentence requested by the government is greater than necessary. Comparing Mr. Joseph's behavior to the panoply of January 6 defendants, his conduct was less serious than those who brought weapons with them and caused injury to officers. He also stands apart from many January 6 defendants in that he did not glorify or minimize his conduct after the fact.

## V. CONCLUSION

We are not asking that this Court let Mr. Joseph off the hook for his bad conduct. Mr. Jospeh respectfully moves this court to impose a sentence of home confinement, two years supervised release, 200 hours of community service, and $2,000 restitution. This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a). It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Joseph as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment

to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,


By:      /s/   *Kira A. West*
Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com


## CERTIFICATE OF SERVICE

I hereby certify on the 29th day of October, 2024 a copy of same was

delivered to the parties of record pursuant to the  rules of the Clerk of Court.

*Kira West*              /S/
Kira Anne West